ADONICA SHAW
3236 Clayton Rd
Concord CA 94519
shawa9111@gmail.com
925-690-5145
415-499-2268

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ADONICA SHAW<br><br>(PLAINTIFF)<br><br>Vs<br><br>CITY OF BOSTON;<br><br>COPLEY MANAGEMENT & DEVELOPMENT CORP.;<br><br>BROADWAY REAL ESTATE TRUST;<br><br>JFL REAL ESTATE SERVICES;<br><br>and JOSEPH LEARY,<br><br>(DEFENDANTS) | **CASE #**<br><br>COMPLAINT FOR VIOLATIONS OF 42 U.S.C. §§ 1981, 1982, 1983, 1985(3); AND STATE LAW CLAIMS<br><br>(Jury Trial Demanded) |

FILED
IN CLERKS OFFICE
2026 SEP -3 A 11:54
U.S. DISTRICT COURT
DISTRICT OF MASS.

INTRODUCTION

1. Plaintiff Adonica Shaw ("Plaintiff" or "Ms. Shaw") brings this action solely in her individual capacity. Wingwomen Inc. is not a party to this case and does not assert any claim herein. Although certain facts alleged below arose from Plaintiff's role as founder and CEO of Wingwomen Inc., Plaintiff seeks recovery only for injuries she personally suffered, including personal financial loss, lost business opportunities, reputational harm, emotional distress, and interference with her own civil rights.

2. This is a civil rights action for damages and injunctive relief arising from a coordinated and discriminatory campaign to prevent Plaintiff, an African American woman entrepreneur and doula, from opening and operating her business in South Boston, and from a continuing pattern of interstate retaliation and intimidation designed to deprive her of her civil rights and silence her opposition to racial discrimination.

3. Between June 2023 and the present, Defendants, through a pattern of fraudulent misrepresentation, deliberate delays, racial discrimination, disability discrimination, retaliation, and interstate intimidation, sabotaged the launch of Ms. Shaw's maternal healthcare company, caused the financial ruin of her business, destroyed her professional reputation, and subjected her to ongoing harassment and home invasions in Concord, California.

4. Plaintiff originally filed a complaint with the Massachusetts Commission Against Discrimination ("MCAD") on June 11, 2024. The MCAD accepted Plaintiff's amended complaint. On April 14, 2026, Plaintiff withdrew her MCAD complaint to pursue this civil action. On May 14, 2026, Plaintiff filed a civil action in the Suffolk County Superior Court (Docket No. 2684CV01411), which remains unserved. Plaintiff now files this

action in federal court to preserve all federal and state claims, to obtain the full protection of federal civil rights statutes, and to address ongoing interstate retaliation that threatens her personal safety and civil rights.

5. This action seeks redress for violations of 42 U.S.C. §§ 1981, 1982, 1983, and 1985(3); Massachusetts General Laws Chapter 151B, which prohibits discrimination in commercial real estate and interference with civil rights; Chapter 93A, which prohibits unfair and deceptive business practices; the Massachusetts Civil Rights Act, M.G.L. c. 12, §§ 11H and 11I; and related common law torts including fraudulent misrepresentation, intentional interference with advantageous economic relations, civil conspiracy, and intentional infliction of emotional distress.

6. The Defendants' actions were not isolated incidents but occurred within the well-documented historical context of racial exclusion and hostility in South Boston. Their conduct leveraged and perpetuated these historical patterns, contributing to and creating a hostile environment uniquely targeted at Ms. Shaw and black individuals who may wish to transact or open businesses in South Boston because of her race and perceived disability. This conduct included making knowingly false promises to induce Ms. Shaw into a commercial lease, systematically delaying critical construction and permitting, interfering with her business and financial relationships, retaliating against her when she asserted her rights, and, most recently, engaging in or facilitating interstate intimidation through unauthorized home invasions in California designed to coerce her into abandoning her claims.

## JURISDICTION AND VENUE

### I. SUBJECT MATTER JURISDICTION

7. This Court has original subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) because this action arises under the laws of the United States, specifically 42 U.S.C. §§ 1981, 1982, 1983, and 1985(3).

8. 42 U.S.C. § 1981 provides that all persons within the jurisdiction of the United States shall have the same right in every State and territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens. Plaintiff's claims arise from Defendants' race-based interference with her right to enter into, perform, and enforce a commercial lease on equal terms.

9. 42 U.S.C. § 1982 provides that all citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property. Defendants' discrimination in the terms, conditions, and delivery of the leased premises violated this right.

10. 42 U.S.C. § 1983 provides a cause of action against any person who, under color of any statute, ordinance, regulation, custom, or usage of any State or Territory, subjects or causes to be subjected any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws. Defendant City of Boston, acting through its employees and agents in the Department of Inspectional Services, violated Plaintiff's rights to equal protection and due process under the Fourteenth Amendment by engaging in discriminatory permitting practices, arbitrary license denials, and deliberate obstruction that disadvantaged Plaintiff as a Black business owner.

11. 42 U.S.C. § 1985(3) prohibits conspiracies between two or more persons to deprive any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws. Defendants entered into an agreement, understanding, or conspiracy to obstruct Plaintiff's business, deprive her of her civil rights, and intimidate her into silence through a coordinated campaign of misrepresentation, permitting obstruction, coercive buyout demands, eviction, reputational sabotage, and interstate harassment. The conspiracy was motivated by racial animus and the specific intent to deprive Plaintiff, as a Black woman, of equal treatment in commercial leasing and business operations.

12. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a) because those claims are so related to Plaintiff's federal claims that they form part of the same case or controversy under Article III of the United States Constitution. Plaintiff's state law claims, including claims under M.G.L. c. 151B, M.G.L. c. 93A, M.G.L. c. 12 §§ 11H–11I, and common law torts, arise out of the same nucleus of operative facts as her federal civil rights claims.

II. PERSONAL JURISDICTION

13. This Court may exercise personal jurisdiction over Defendants City of Boston, Copley Management & Development Corp., Broadway Real Estate Trust, JFL Real Estate Services, and Joseph Leary because they reside in Massachusetts, transact business in Massachusetts, and/or caused tortious injury in Massachusetts by acts or omissions occurring in Massachusetts.

14. The conspiracy to discriminate against Plaintiff and deprive her of civil rights was formed, directed, and executed in substantial part from Massachusetts. Defendants Joseph Leary, JFL Real Estate Services, Copley Management & Development Corp., and

Broadway Real Estate Trust conducted the fraudulent lease inducement, permitting obstruction, coercive buyout demands, and eviction proceedings in Massachusetts. Defendant City of Boston acted through Massachusetts-based employees and agencies.

15. The interstate acts of intimidation and retaliation alleged herein, including the August 2026 home invasions in Concord, California, were overt acts in furtherance of a conspiracy and retaliation pattern that originated in Massachusetts, was directed by Massachusetts-based defendants, and constitutes part of a single, continuing scheme to deprive Plaintiff of her civil rights. Personal jurisdiction over Defendants for the federal civil rights claims is therefore proper in the District of Massachusetts.

16. Plaintiff does not assert the California break-ins as independent state-law tort claims in this District. Rather, the August 20 and August 27, 2026, intrusions are pled solely as overt acts in furtherance of the federal civil rights conspiracy under 42 U.S.C. § 1985(3) and as retaliatory conduct under 42 U.S.C. § 1981(b). Because the conspiracy and discriminatory scheme were formed and directed from Massachusetts, and because all Defendants are subject to personal jurisdiction in Massachusetts, this Court has jurisdiction over the federal claims of which the California acts are merely the latest manifestation.

## III. VENUE

17. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in the District of Massachusetts. The discriminatory lease negotiations, fraudulent inducement, permitting obstruction, coercive buyout demands, eviction proceedings, and the formation of the conspiracy all occurred in Suffolk County, Massachusetts.

18. Venue is also proper under 28 U.S.C. § 1391(b)(1) because all Defendants reside in the Commonwealth of Massachusetts, and the District of Massachusetts is a judicial district in which the defendants reside.

19. Venue is further proper under 28 U.S.C. § 1391(b)(3) if no other district would satisfy subsections (1) or (2), because all Defendants are subject to this Court's personal jurisdiction with respect to this action.

## IV. STATUTE OF LIMITATIONS AND RELATION BACK

20. Plaintiff's federal claims under 42 U.S.C. §§ 1981 and 1982 are subject to a four-year statute of limitations. See Jones v. R.R. Donnelley & Sons Co., 541 U.S. 369 (2004). The discriminatory acts alleged herein began in June 2023 and continued through at least August 2026. This action is therefore timely.

21. Plaintiff's federal claims under 42 U.S.C. §§ 1983 and 1985(3) are subject to Massachusetts' three-year personal injury statute of limitations. See Wilson v. Garcia, 471 U.S. 261 (1985). The alleged constitutional violations and conspiracy were not discrete, isolated acts but rather a continuing violation consisting of an ongoing pattern and practice of discrimination, retaliation, and intimidation. The most recent overt acts, including the August 20 and August 27, 2026, home invasions in California, constitute part of the same continuing course of conduct. This action is therefore timely under the continuing violations doctrine.

22. In the alternative, the statute of limitations for Plaintiff's § 1983 claims is subject to equitable tolling because Defendants' fraudulent concealment of their true permitting timeline, their false representations, and their ongoing obstruction prevented Plaintiff from discovering the full scope of the constitutional violations until the MCAD investigation produced documents revealing the falsity of Defendants' representations.

23. Plaintiff filed a timely MCAD complaint on June 11, 2024, which tolled the statute of limitations for her Massachusetts state law claims. She withdrew from MCAD on April 14, 2026, and filed her Superior Court complaint on May 14, 2026. That Superior Court filing preserved her state law claims. This federal complaint, filed within the applicable limitations periods for both federal and state claims, is timely.

24. Plaintiff respectfully requests that this Court deem this federal action to relate back to her May 14, 2026, Superior Court filing and, where applicable, to her June 11, 2024, MCAD complaint, to the maximum extent permitted by Federal Rule of Civil Procedure 15(c) and applicable law.

THE PARTIES

25. Plaintiff Adonica Shaw is an individual resident of Concord, California. She is the founder and CEO of Wingwomen Inc. and Wingwomen Technologies Inc. At all relevant times, she sought to establish a brick-and-mortar maternal health clinic at a property owned and managed by Defendants in South Boston, Massachusetts. Plaintiff seeks recovery only for injuries she personally suffered, including personal financial loss, lost business opportunities, reputational harm, emotional distress, physical invasion of her home, ongoing fear for her personal safety, and interference with her own civil rights. She has diabetes, a recognized disability under state and federal law.

26. Wingwomen Inc. is not a party to this case and does not assert any claim herein. Although certain facts alleged below arose from Plaintiff's role as founder and CEO of Wingwomen Inc., nothing in this Complaint is intended to assert, duplicate, or impair any separate claims that Wingwomen Inc., its investors, or any other person or entity may possess.

27. Defendant Joseph Leary is an individual who acted as a leasing representative, broker, and agent for Defendants Copley Management & Development Corp. and Broadway Real Estate Trust. Leary made material representations that induced Plaintiff to enter the lease. Leary is associated with JFL Real Estate Services, through which he conducted leasing activities for the subject property. Leary resides in Massachusetts and is subject to the jurisdiction of this Court.

28. Defendant JFL Real Estate Services is a business entity associated with Joseph Leary and involved in the leasing and property-related communications at issue. JFL Real Estate Services acted as the leasing broker for Broadway Real Estate Trust and Copley Management & Development Corp. in connection with the subject premises. JFL Real Estate Services transacts business in Massachusetts and is subject to the jurisdiction of this Court.

29. Defendant Copley Management & Development Corp. ("Copley Management") is a corporate entity that owned, managed, and/or controlled the subject premises and was responsible for construction, permitting, and delivery of the leased space. Copley Management transacts business in Massachusetts and is subject to the jurisdiction of this Court.

30. Defendant Broadway Real Estate Trust ("Broadway Real Estate") is a corporate entity that owned, managed, and/or controlled the subject premises located in South Boston, Massachusetts. Broadway Real Estate transacts business in Massachusetts and is subject to the jurisdiction of this Court.

31. Defendant City of Boston ("the City"), acting through its Department of Inspectional Services ("ISD") and related employees and agents, was responsible for permitting, inspection, and occupancy-related approvals. The City is a municipal corporation subject

to suit under 42 U.S.C. § 1983 and is subject to the jurisdiction of this Court. At all relevant times, the City's employees and agents acted under color of state law.

32. At all times relevant hereto, Defendants Joseph Leary, JFL Real Estate Services, Copley Management & Development Corp., and Broadway Real Estate Trust acted in concert, as agents of one another, and pursuant to a common plan or scheme to discriminate against Plaintiff, obstruct her business, and deprive her of her civil rights. Leary, as broker for JFL Real Estate Services, tied his representations to Broadway Real Estate Trust and Copley Management. Because Copley Management and Broadway Real Estate Trust are reliant upon City of Boston Inspectional Services for permitting and certificates of occupancy, and because Leary, JFL, Copley, and Broadway regularly rely on each other's representations in the ordinary course of their property development and leasing business, they maintained an ongoing interdependent relationship that facilitated the coordinated conduct alleged herein.

33. At all times relevant hereto, Defendant City of Boston, through its ISD employees and agents, aided, abetted, and facilitated the discriminatory and obstructive conduct of the private Defendants by creating unreasonable and pretextual delays in the permitting process, withholding critical information, and applying discriminatory standards to Plaintiff's business license application.

## STATEMENT OF FACTS

### A. Social and Historical Context

34. Defendants' actions occurred in South Boston, a neighborhood with a deeply documented history of racial segregation and violent resistance to integration. The court-ordered desegregation of Boston's public schools in the 1970s, detailed in Morgan v. Hennigan,

379 F. Supp. 410 (D. Mass. 1974), was met with intense hostility in South Boston, cementing its national reputation for racial intolerance.

35. Federal courts acknowledge the history of racial tension and segregation in subsequent housing discrimination cases, such as Schmidt v. Boston Housing Authority, 505 F. Supp. 988 (D. Mass. 1981), which dealt with the legacy of segregated public housing developments in South Boston and other parts of the city.

36. The hostility during the desegregation era was particularly severe, with the First Circuit in Tallulah Morgan v. John J. McDonough, 540 F.2d 527 (1st Cir. 1976), finding that Black students were subjected to continuous verbal abuse and intimidation, including chants of "2, 4, 6, 8 assassinate the nigger apes" and being surrounded by "evidence of racial hostility." This pattern of racially motivated violence has persisted, as shown in Commonwealth v. Sudler, 112 N.E.3d 828 (Mass. App. Ct. 2018), which involved a racially motivated assault where the defendant declared, "I hate you South Boston niggers."

37. Against this backdrop, Defendants engaged in a pattern of conduct that included material misrepresentations, unexplained delays, differential treatment, unauthorized entries into Plaintiff's leased premises, coercive settlement demands, and retaliation after Plaintiff complained of discrimination. These actions disproportionately impacted Plaintiff as a Black business owner and support an inference of discriminatory intent.

38. The economic dimension of this exclusion was noted in Associated General Contractors of Massachusetts, Inc. v. Altshuler, 361 F. Supp. 1293 (D. Mass. 1973), which found a "racial imbalance" in Boston's construction trades resulting from past discrimination. The conduct alleged herein is also consistent with Boston's history of institutional bias and the weaponization of false, racialized narratives, as tragically exemplified by the 1989 Charles Stuart case. Law enforcement and public officials accepted a fabricated story

about a Black assailant, leading to the wrongful targeting of Black men and causing immense harm to the Black community. This history, for which the City of Boston formally apologized in December 2023, occurred during the events described in this complaint, and further demonstrates a pattern where racial bias can infect official processes and lead to devastating, foreseeable harm against Black individuals.

39. The City of Boston's licensing and permitting practices have also been challenged as creating barriers for Black entrepreneurs. In Tyler v. Gross, No. 22-cv-10089-DJC (D. Mass. May 31, 2022), an African American businessman challenged the City of Boston's licensing practices for construction and demolition work, alleging that the City maintained "different standards for companies with longstanding relationships with the city while at the same time proclaiming diversity goals and initiatives." The court noted the irony that Boston's stated commitment to "reduce barriers and encourage more minority- and woman-owned businesses" stood in tension with its restrictive licensing practices that disadvantaged new minority-owned enterprises.

B. Interdependent Relationships and Reliance Among Defendants

40. Joseph Leary acted as the broker for JFL Real Estate Services, which served as the leasing broker for the property owned by Broadway Real Estate Trust and managed by Copley Management & Development Corp. In that capacity, Leary made representations to Plaintiff on behalf of all three entities. Leary's statements, promises, and representations were attributable to and binding upon Copley Management and Broadway Real Estate Trust because they authorized Leary to act as their agent in the leasing transaction, and because they regularly relied on Leary's representations in their ordinary course of business.

41. Copley Management & Development Corp. and Broadway Real Estate Trust are real estate development and management entities that are dependent upon the City of Boston Inspectional Services for permitting, inspection approvals, and certificates of occupancy. Without ISD approval, Copley Management and Broadway Real Estate Trust cannot lawfully deliver commercial premises to tenants or operate their properties in compliance with Boston's building and occupancy codes. This dependency creates a regular and ongoing relationship between the private defendants and City ISD officials.

42. Because of this dependency, Copley Management, Broadway Real Estate Trust, and their broker Joseph Leary regularly rely on representations from City ISD employees regarding permitting timelines, inspection schedules, and occupancy readiness. Conversely, City ISD employees regularly rely on representations from Copley Management, Broadway Real Estate Trust, and their agents regarding the status of work, contractor qualifications, and code compliance. This mutual reliance creates an interdependent relationship in which the private defendants and public officials regularly coordinate, communicate, and rely on each other's representations in the ordinary course of property development and leasing.

43. Joseph Leary specifically represented to Plaintiff that Copley Management was able to get applications through the City "fast all of the time," implying that Copley Management and Broadway Real Estate Trust had special relationships at the City that would allow them to move applications through quickly. This representation was material to Plaintiff's decision to sign the lease and pay the deposit, and it was made based on Leary's knowledge of Copley Management's and Broadway Real Estate Trust's ongoing business relationships with City ISD officials.

44. The interdependent relationship among Leary, JFL Real Estate Services, Copley Management, Broadway Real Estate Trust, and City ISD officials is not merely a

commercial arrangement. It created the conditions for a tacit understanding and coordinated plan to obstruct Plaintiff's business, deprive her of her civil rights, and ultimately drive her from the property. Because these defendants regularly relied on each other's representations and were dependent on each other for the successful completion of the leasing transaction, they had motive, opportunity, and means to conspire to deprive Plaintiff of equal protection and equal privileges under the law.

C. Fraudulent Inducement and Lease Formation (June – August 2023)

45. In June 2023, Plaintiff and her then-business partner identified a commercial loft space on Broadway in South Boston for Plaintiff's maternal health clinic.

46. Plaintiff explained to Defendants the clinic's specific needs, including plumbing, sink installation, soundproofing, and other modifications necessary for healthcare operations and compliance.

47. Joseph Leary, acting for JFL Real Estate Services, Copley Management & Development Corp., and Broadway Real Estate Trust, represented that the requested build-out was feasible and that the premises would be delivered in a fully built-out and occupancy-ready condition within approximately three weeks of signing.

48. Those representations were material and were made to induce Plaintiff to sign the lease and provide funds.

49. Relying on those representations, Plaintiff executed a Letter of Intent on or about July 7, 2023, and paid a $20,000 deposit.

50. Plaintiff also took substantial action in reliance on the promised timeline, including securing staff, pursuing insurance credentialing, and preparing to open the clinic.

51. The promised three-week build-out timeline was false. The work required more extensive permitting and build-out than Defendants represented, including permits that could not be completed on the rushed schedule Defendants promised.

52. By August 2023, it was clear the promised timeline would not be met. Defendant Leary began to evade questions and offer vague, shifting excuses. The delay immediately jeopardized Ms. Shaw's business, as insurance compliance and staffing were tied to the September 1, 2023, operational date.

53. Joseph Leary also repeatedly stated during the original meeting and subsequent conversations, emails, and text messages that Copley was able to get applications through fast all of the time, implying that they had relationships at the city that would allow them to move applications through quickly.

D. Permitting Delays and City of Boston Conduct

54. The City of Boston, through Inspectional Services employees and agents, repeatedly caused or contributed to delays in the permitting and approval process.

55. During the administrative proceedings, City records and communications reflected that the permitting process and related application history were inconsistent with the timeline represented by Joseph Leary and the property defendants. These records demonstrated that the permitting process could not reasonably have been completed within the approximately three-week timeframe represented to Plaintiff.

56. Plaintiff also communicated with City officials regarding plumbing and code compliance issues and sought confirmation concerning the status and sufficiency of the work.

57. The premises did not receive a Certificate of Occupancy until February 22, 2024, long after Defendants' promised opening timeline had passed.

58. When attempting to obtain a business license, a City employee named Kellie Donovan repeatedly and wrongfully rejected her application, falsely claiming she lacked a valid lease and proper paperwork. On a subsequent visit, another employee immediately approved the same documents and asked Ms. Shaw, "Has somebody been messing with you?", implying awareness of the improper obstruction. This differential treatment, where one municipal employee arbitrarily denied Ms. Shaw's application while another immediately recognized the documents were sufficient, supports an inference of arbitrary, disparate, or discriminatory treatment.

59. During the fall of 2023, the City of Boston ISD withheld information that the Certificate of Occupancy was not imminent and that the applications on file did not support the represented timeline. Although City personnel later stated that the individual responsible for reviewing the applications was unavailable for personal reasons, the application remained stalled, and the status of the application was not clearly disclosed to Plaintiff. This omission materially affected Plaintiff's understanding of whether the project could be completed on the promised schedule.

60. In January and February 2024, William Foley did not respond to Plaintiff's emails about whether the PVC piping complied with code. Plaintiff was referred back to Foley when she asked other department personnel the same question.

61. Plaintiff independently contacted the Massachusetts Division of Occupational Licensure, Board of State Examiners of Plumbers and Gas Fitters, to verify whether the plumbing installation at the premises complied with applicable code requirements. On June 6, 2024, Michael J. Guida Sr., Board Code Consultant, responded after reviewing a photograph of the installation. Mr. Guida stated that the installation "looks like a kitchen sink" and "would be missing a cleanout as required by code." Mr. Guida also identified additional concerns regarding the use of PVC in a commercial setting and related code issues.

62. After Plaintiff informed property management and their attorney Rob McLaughlin of the Board's response, the examiner mysteriously ceased all communication. The fact that these issues were apparent from the photograph, yet were not clearly disclosed to Plaintiff by Defendants, reinforced Plaintiff's concern that Defendants were withholding material information.

63. Plaintiff later learned from the State Board of Plumbers and Gas Fitters that, based on the images presented, the pipes were not up to code.

64. The unresolved code-compliance issues and uncertainty surrounding the validity of the occupancy process created substantial reputational and economic harm to Plaintiff. Investors, business partners, and professional contacts questioned the viability of the project, contributing to lost opportunities and diminished confidence in Plaintiff's business leadership.

E. Hostile and Retaliatory Conduct (August 2023 – April 2024)

65. Plaintiff was subjected to racially charged comments and a hostile environment in South Boston while trying to open her business.

66. In mid-September 2023, after being given keys but still no certificate of occupancy, Plaintiff began preparing the space. At a nearby Home Depot, she was confronted by two white men who, upon learning she was a Black woman from California opening a business in South Boston, expressed shock. One stated, "Things must be changing over there, because they don't let people like you in there." This interaction caused Plaintiff to feel acutely unsafe and targeted.

67. Plaintiff is informed and believes that Defendants' conduct toward her differed from the treatment afforded to other commercial tenants. Based on responsive pleadings from Broadway Real Estate Trust and Copley Management and Development Corp., Plaintiff

was the only Black business owner within the property, and no other tenant was subjected to the same combination of unauthorized entries, buyout demands, pressure to abandon civil rights claims, permitting obstruction, and retaliatory conduct.

68. Plaintiff experienced a race-based confrontation near the property and was warned about hostility toward Black-owned businesses in the neighborhood.

69. On no fewer than three occasions, unknown individuals entered Plaintiff's locked commercial unit without authorization, notice, or legitimate business purpose. Following these entries, Plaintiff discovered furniture repositioned, business documents and materials disturbed, and unexplained handprints left on interior walls. Plaintiff had not authorized access to the premises, nor had Defendants provided any lawful explanation for the entries. The repeated intrusions interfered with Plaintiff's use, possession, and enjoyment of the leased premises, compromised the security of her business records and property, and created an atmosphere of intimidation and fear.

70. The unauthorized entries included specific, documented incidents:

a. Around the end of January 2024, Plaintiff arrived at her office and discovered that the unit had been locked even though she had not locked it, and her keys remained inside the office. Plaintiff texted Adelmo Oliveira and Joseph Leary about the issue. Leary responded that he was not at the building that day, that someone from Copley or a contractor probably locked it, and that he was nowhere near the building and could not come open the door.

b. On January 31, 2024, Plaintiff notified property management, including Ryan Pittsley and Sean Williamson, by email that her office door had been locked without her authorization and that she did not know who had entered the unit.

c. On February 8, 2024, Plaintiff observed a large handprint on the hallway wall in the entry area of the unit. Plaintiff is approximately 5 feet 8 inches tall, and the handprint was

placed significantly higher than her own reach, suggesting that a much taller individual had been inside the space. Plaintiff perceived the handprint as threatening and intimidating. February 8, 2024, was also Plaintiff's son's birthday. Instead of being home with her family, she was dealing with fear and anxiety relating to the condition of her office and the possibility that unknown individuals had again entered the space to harm her.

d. Later in February 2024, Plaintiff entered the unit and discovered that an orange velveteen couch she had purchased in California and placed inside the office had been moved across the room. The couch had been positioned partially in front of the exam room entrance, obstructing access to the room. Plaintiff was so scared, she left.

71. By that point, the disturbances no longer appeared accidental or incidental. The movement of large furniture, combined with the repeated disturbances and unexplained access to the unit, caused Plaintiff to believe the conduct was intended to frighten, intimidate, or harass her.

72. By the end of February 2024, all required inspections and sign-offs relating to the unit had already been completed, and there was no legitimate reason for repeated unannounced entry into the space.

73. On February 28, 2024, Plaintiff again notified property management by email regarding unauthorized entry into the unit and explained that she believed the conduct appeared targeted and intimidating in light of South Boston's history toward Black residents and business owners.

74. In response, Sean Williamson acknowledged by email that many individuals had been "in and out" of the unit since September in connection with work and inspections. Prior to that disclosure, Plaintiff had not been informed that numerous individuals possessed access to the unit or keys to the space. To this day, it remains unclear who specifically

had access to the unit; whether logs or schedules existed documenting entry into the space; what keys or methods of access were used; if the City of Boston issued those keys or authorized access, or property management, and who is liable for what occurred; and whether the property management company or another entity maintained oversight of access to the premises.

75. Upon information and belief, multiple contractors, tradespersons, property-management personnel, and other individuals possessed access to the premises through the lock and key system utilized during the buildout process. After Plaintiff reported the unauthorized entries, Defendants informed her that multiple contractors and tradespersons possessed keys or access credentials to the premises through the lock system then in use. This explanation confirmed that access to the unit was not limited to Plaintiff and that Defendants knew numerous individuals could enter the premises. Despite this knowledge and repeated reports of unauthorized entries, Defendants failed to disclose the information, timely restrict access before Plaintiff's reports, replace the lock core, identify those with access, or otherwise secure the premises prior to Plaintiff's loss.

76. The repeated unauthorized entries occurred after Plaintiff became known as a Black business owner attempting to establish a maternal-health clinic in South Boston and after she began raising concerns regarding permitting delays, code-compliance issues, and discriminatory treatment. Upon information and belief, similarly situated non-Black tenants were not subjected to comparable unauthorized entries, intimidation, buyout efforts, or demands that they waive their civil-rights protections.

77. Plaintiff reported the incidents to Defendants Broadway Real Estate Trust and Copley Management & Development Corp., yet the conduct was not adequately investigated, explained, or prevented. Despite being informed that multiple contractors, tradespersons, and other individuals possessed access to the premises, Defendants failed to identify the

individuals with access, implement adequate key-control procedures, or promptly secure the premises.

78. Upon information and belief, the unauthorized entries were not random occurrences but were intended to intimidate Plaintiff, interfere with her ability to operate her business, and pressure her to abandon the premises and cease asserting her rights. The timing of the entries, together with Defendants' subsequent buyout demand, proposed waiver of MCAD rights, and retaliatory conduct, supports an inference that the entries formed part of a coordinated effort to coerce Plaintiff through threats, intimidation, or coercion.

79. After Plaintiff refused to abandon her claims and rights, Rob McLaughlin, on behalf of Defendants Broadway Real Estate Trust and Copley Management and Development Corp., offered her a $5,000 buyout to leave the property and return to California. They offered to give back the $20,000 deposit, and McLaughlin disclosed that the landlord did not want Plaintiff there anymore.

80. Plaintiff did not take the money or the offer. To her knowledge, as she writes this, no other business owner at the property reported the same incidents or had been offered money to leave based on issues they reported involving race, imminent harm, or protected status.

81. After Ms. Shaw refused the discriminatory $5,000 buyout offer, Defendants shifted tactics and attempted to extract a more insidious concession. Presenting themselves as seeking to "smooth the relationship," Defendants offered Ms. Shaw a forbearance agreement that would condition the continued tenancy of her business on her agreement not to report the ongoing issues to the Massachusetts Commission Against Discrimination (MCAD). Plaintiff alleges that the proposed agreement was coercive, retaliatory, and intended to discourage her from exercising rights protected by M.G.L. c. 151B. The agreement attempted to tie Ms. Shaw's personal rights as an individual to the

business tenancy, requiring her to surrender her statutory right to file discrimination complaints with the MCAD as a condition of allowing her business to remain in the premises.

82. When Plaintiff refused to surrender her rights, Defendants retaliated by initiating eviction-related actions and continuing to interfere with her business and reputation. Defendants had no legitimate personal or individual basis to bind her as an individual, or to condition the business tenancy on her waiver of individual civil rights.

83. Defendants' attempt to condition tenancy-related benefits upon Plaintiff's agreement not to pursue remedies through the MCAD constitutes evidence of coercion, retaliation, and unfair or deceptive conduct.

84. This coercive offer was not extended to any other tenant at the premises.

85. Following Plaintiff's complaints regarding discrimination, permitting delays, and code compliance issues, Defendants and their agents repeatedly dismissed Plaintiff's concerns, characterized her complaints as irrational or unfounded, and represented to others that no discrimination had occurred. Defendants further treated Plaintiff as though she suffered from a disqualifying mental or medical condition despite possessing no basis to make such assertions. These actions damaged Plaintiff's reputation and credibility within her professional community.

F. Reputational and Professional Harm (October 2023 – Present)

86. Defendants' conduct caused Plaintiff to lose business opportunities, investor confidence, and professional standing.

87. Plaintiff's former business partner departed in December 2023. Communications associated with that departure reflected race-related and exclusionary assumptions.

88. Plaintiff also suffered downstream professional harm in her midwifery and maternal-health network as misinformation spread about her business failure.

89. The harm from Defendants' actions extended beyond the leased premises and business venture itself. After returning to California, Plaintiff discovered that misinformation concerning the circumstances surrounding the failure of her clinic had spread within portions of the maternal-health and midwifery community. As a result, Plaintiff experienced professional isolation, loss of educational opportunities, diminished credibility, and interference with professional advancement. An investigation by the Midwifery Education Accreditation Council subsequently concluded that Plaintiff had been adversely affected and subjected to discrimination.

90. On or about August 23, 2024, Governor Healey signed legislation expanding reimbursement for doula and midwifery services, confirming that Plaintiff's timing and market preparedness would have been strategic. Had Defendants accurately disclosed the true permitting and occupancy timeline from the outset, Ms. Shaw would have been positioned to become the first Black business owner to establish a prominent maternal-health clinic in South Boston at the precise moment this new state-funded revenue stream became available.

91. Since maternal-health companies such as Mahmee and Mae announced significant funding rounds, confirming strong market interest in the sector, Plaintiff's attention to a Boston market entry was founded on correct data and assumptions. As a result of Defendants' conduct, Plaintiff's personal and professional reputation was damaged, investor confidence deteriorated, and opportunities that otherwise would have been available became unavailable.

92. The inability to launch during this critical window of legislative change and market momentum constitutes a distinct and quantifiable economic loss. Defendants' delays and obstruction caused Plaintiff to miss this critical market window.

93. The cumulative impact of Defendants' actions has caused ongoing and catastrophic financial, professional, and personal harm. Defendants and their associates have engaged in a smear campaign to destroy Plaintiff's professional reputation within the Boston maternal health and femtech communities.

94. This campaign has been based, in part, on discriminatory animus related to Plaintiff's disability. Plaintiff has diabetes, and upon information and belief, Defendants were aware of her condition or otherwise regarded her as having a disability. Defendants and their associates have weaponized this perception, willfully mischaracterizing symptoms related to her health condition, such as fatigue or irritability that can result from blood sugar fluctuations, as evidence that she is "crazy," emotionally unstable, or otherwise mentally unfit.

95. The commercial lease between Plaintiff and Defendants Copley Management, Broadway Real Estate, and Joseph Leary constituted a contract within the meaning of § 1981.

96. Defendants discriminated against Plaintiff in the terms, conditions, privileges, and performance of the commercial lease because of her race. Defendants' conduct included:

a. Inducing Plaintiff into the lease through false promises of a three-week build-out that were not made to other tenants;

b. Imposing unreasonable and pretextual delays in construction and permitting;

c. Making a discriminatory and coercive $5,000 buy-out offer not extended to other tenants;

d. Fostering a hostile business environment through unauthorized entries and racially charged community hostility;

e. Retaliating against Plaintiff for asserting her rights;

f. Making an extortionate forbearance offer conditioned on waiver of civil rights protections, not extended to other tenants; and

g. Initiating eviction proceedings after Plaintiff refused to surrender her rights.

97. Defendants' shifting and false reasons for their failure to deliver the premises constitute evidence of pretext for unlawful discrimination.

98. No similarly situated non-Black tenant was subjected to the same combination of intimidation, unauthorized intrusions, permitting obstruction, buyout demands, retaliatory conduct, and efforts to secure the waiver of statutory civil-rights protections.

99. Defendants' actions were motivated by racial animus and would not have been taken against a similarly situated white business owner. The disparate treatment denied Plaintiff the full and equal benefit of her lease and the opportunity to operate her business free from racial discrimination.

100. As a direct and proximate result of Defendants' violations of § 1981, Plaintiff has suffered significant financial losses, emotional distress, reputational harm, loss of earning capacity, and deprivation of her civil rights.

COUNT II: Violation of 42 U.S.C. § 1982 (Race Discrimination in Property Rights)

101. Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

102. 42 U.S.C. § 1982 provides that all citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property.

103. Plaintiff sought to lease, occupy, and use commercial property in South Boston on equal terms with white citizens.

104. Defendants, through race-based discrimination, denied Plaintiff the equal right to lease, occupy, and enjoy the premises. Defendants subjected Plaintiff to:

a. Fraudulent inducement into a lease on false terms;

b. Permitting obstruction and code-compliance failures that prevented timely occupancy;

c. Unauthorized entries into her locked unit that compromised her security and possession;

d. A hostile environment that made her feel unsafe and targeted;

e. Discriminatory buyout and forbearance demands designed to drive her from the property; and

f. Retaliatory eviction proceedings.

105. Plaintiff was the only Black business owner known to Defendants within the property. The differential treatment was race-based and violated her right to equal enjoyment of property under § 1982.

106. As a direct and proximate result of Defendants' violations of § 1982, Plaintiff has suffered financial loss, emotional distress, and deprivation of her property rights.

COUNT III: Violation of 42 U.S.C. § 1983 (Equal Protection and Due Process . City of Boston)

107. Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

108. 42 U.S.C. § 1983 provides a cause of action against any person who, under color of any statute, ordinance, regulation, custom, or usage of any State or Territory, subjects or causes to be subjected any citizen to the deprivation of any rights, privileges, or immunities secured by the Constitution.

109. Defendant City of Boston is a municipal corporation and a "person" subject to suit under § 1983. Monell v. Dep't of Social Servs., 436 U.S. 658 (1978).

110. The City of Boston, acting through its Department of Inspectional Services and employees including Kelly Donovan, William Foley, and other agents, acted under color of state law at all relevant times.

111. The City's employees and agents deprived Plaintiff of her constitutional rights to equal protection and due process under the Fourteenth Amendment by:

a. Applying discriminatory and arbitrary standards to Plaintiff's business license application, resulting in wrongful denial by one employee while another immediately approved the same documents;

b. Creating unreasonable and pretextual delays in the permitting and inspection process;

c. Withholding critical information about the status of permit applications, thereby preventing Plaintiff from making informed business decisions;

d. Failing to enforce building codes in a non-discriminatory manner;

e. Extending false promises through current and former employees of the Mayor's office to reconcile outstanding issues, and address issues of racial disparities in South Boston, failing to do so, and delaying promised relief; and

f. Engaging in conduct that was consistent with a documented pattern and practice of creating barriers for Black entrepreneurs in Boston, as recognized in Tyler v. Gross, No. 22-cv-10089-DJC (D. Mass. 2022).

112. The City's conduct was not the result of isolated employee misconduct but reflected a municipal custom or practice of inadequate training, oversight, and accountability in the permitting and licensing process that had the foreseeable effect of disadvantaging minority-owned businesses. The City's licensing practices have been judicially noted as imposing disparate burdens on Black entrepreneurs despite the City's public commitments to diversity.

113. The City's failure to address known disparities in its permitting process, and its employees' deliberate obstruction of Plaintiff's application, constitute a policy, custom, or practice of deliberate indifference to the constitutional rights of Black business owners.

114. As a direct and proximate result of the City's violations of § 1983, Plaintiff has suffered financial loss, emotional distress, deprivation of her right to equal treatment under the law, and loss of business opportunity.

COUNT IV: Violation of 42 U.S.C. § 1985(3) (Conspiracy to Deprive Civil Rights)

115. Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

116. 42 U.S.C. § 1985(3) prohibits conspiracies between two or more persons to deprive any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws.

117. Defendants Joseph Leary, JFL Real Estate Services, Copley Management & Development Corp., Broadway Real Estate Trust, and City of Boston, acting in concert with each other and with other known and unknown persons, entered into an agreement, understanding, or conspiracy to deprive Plaintiff of her civil rights.

118. The object of the conspiracy was to prevent Plaintiff, a Black woman entrepreneur, from establishing and operating a maternal health clinic in South Boston; to extract her deposit and capital through fraudulent inducement; to obstruct her business through permitting delays and code violations; to intimidate her into abandoning her civil rights claims; to coerce her into waiving her statutory rights; and to destroy her professional reputation and economic prospects.

119. The conspiracy was motivated by a class-based, invidiously discriminatory animus against Plaintiff because of her race (Black) and her status as a Black woman business owner attempting to enter a historically segregated, predominantly white neighborhood.

120. In furtherance of the conspiracy, Defendants committed and caused to be committed the following overt acts:

a. Joseph Leary made false representations to induce Plaintiff into the lease;

b. Copley Management and Broadway Real Estate concealed the true permitting timeline and installed non-code-compliant plumbing;

c. City of Boston ISD employees obstructed Plaintiff's business license and permitting applications;

d. Unknown individuals entered Plaintiff's locked Massachusetts unit without authorization;

e. Ron McLaughlin Jr. offered Plaintiff a $5,000 buyout to abandon the property and return to California;

f. Defendants presented a coercive forbearance agreement conditioning tenancy on waiver of MCAD rights;

g. Defendants initiated eviction proceedings after Plaintiff refused to surrender her rights;

h. Defendants and their associates circulated false and misleading information about Plaintiff's mental fitness and business competence;

i. On or about August 20, 2026, unknown individuals broke into Plaintiff's California residence;

j. On or about August 27, 2026, unknown individuals broke into Plaintiff's California residence a second time.

121. Each of these overt acts was committed in furtherance of the common plan to deprive Plaintiff of her equal rights in contracting, property, and business operations, and to punish her for asserting those rights.

122. The August 2026 break-ins in California constitute the latest overt acts in a continuing conspiracy. They demonstrate that the conspiracy has not been abandoned and that its perpetrators are willing to engage in interstate criminal conduct to achieve their unlawful objective of silencing Plaintiff and depriving her of civil rights remedies.

122a. The timing, manner, and circumstances of the California break-ins confirm their connection to the Massachusetts conspiracy. The break-ins occurred after Plaintiff filed her Superior Court complaint on May 14, 2026, and after she continued to assert her federal civil rights claims. The intruders targeted Plaintiff's California residence, the location to which she had been coerced to return, at a time when Defendants were actively attempting to force her to abandon her Massachusetts business and legal claims. The break-ins were not random criminal acts; they were facilitated by information about Plaintiff's whereabouts and vulnerabilities that Defendants and their associates had obtained through the Massachusetts scheme, and they served the same unlawful objective of intimidation and silencing that motivated the earlier Massachusetts acts.

123. As a direct and proximate result of the conspiracy and its overt acts, Plaintiff has suffered financial loss, emotional distress, physical invasion of her home, reputational harm, loss of professional standing, and deprivation of her civil rights.

COUNT V: Retaliation under 42 U.S.C. § 1981(b)

124. Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

125. 42 U.S.C. § 1981(b) provides that the protections of § 1981 include the prohibition against retaliation for opposing race discrimination in the making and enforcement of contracts.

126. Plaintiff engaged in protected activity by:

a. Opposing Defendants' race-based discrimination in the commercial lease;

b. Complaining about fraudulent misrepresentations, permitting delays, and discriminatory treatment;

c. Refusing the discriminatory $5,000 buyout offer;

d. Refusing the coercive forbearance agreement that demanded waiver of MCAD rights;

e. Filing a complaint with the Massachusetts Commission Against Discrimination on June 11, 2024;

f. Withdrawing from MCAD to pursue civil remedies;

g. Filing her Superior Court complaint on May 14, 2026; and

h. Continuing to assert her rights through the present action.

127. Defendants retaliated against Plaintiff for her protected activity by:

a. Initiating baseless eviction proceedings;

b. Interfering with Plaintiff's investor relationships and venture capital funding;

c. Engaging in a smear campaign to destroy Plaintiff's professional reputation;

d. Mischaracterizing Plaintiff's diabetes-related symptoms as mental instability;

e. Disseminating false information to professional colleagues and organizations;

f. Blocking Plaintiff's patents, commercialization, and venture capital opportunities; and

g. Engaging in or facilitating the August 20 and August 27, 2026, break-ins of Plaintiff's California residence as acts of intimidation and retaliation.

128. Defendants' retaliatory acts were motivated, in whole or in part, by Plaintiff's opposition to race discrimination and her exercise of rights protected by § 1981.

129. The retaliation was intended to punish Plaintiff for asserting her rights and to coerce her into abandoning her legal claims.

130. As a direct and proximate result of Defendants' retaliatory conduct, Plaintiff has suffered severe financial loss, emotional distress, reputational harm, loss of professional opportunities, physical invasion of her home, and ongoing fear for her personal safety.

COUNT VI: Race and Disability Discrimination in Commercial Leasing (M.G.L. c. 151B. §§ 4(4). 4(4A). 4(8))

131. Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

132. M.G.L. c. 151B prohibits discrimination in commercial real estate and retaliation against persons who oppose discriminatory practices. Plaintiff filed a timely MCAD complaint on June 11, 2024, which tolled the statute of limitations for her state law claims.

133. Defendants discriminated against Plaintiff in the terms, conditions, privileges, and performance of the commercial lease because of her race and disability. Defendants' conduct included false inducement, permitting obstruction, unauthorized entries, coercive buyout demands, forbearance conditioned on waiver of civil rights, and retaliatory eviction.

134. No similarly situated non-Black tenant was subjected to the same combination of discriminatory and retaliatory conduct.

135. Defendants' actions violated M.G.L. c. 151B, §§ 4(4), 4(4A), and 4(8).

COUNT VII: Unfair and Deceptive Acts and Practices (M.G.L. c. 93A, §§ 2, 11)

136. Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

137. Defendants engaged in unfair and deceptive acts and practices in trade or commerce by making material misrepresentations to induce Plaintiff into the lease, concealing permitting problems, and attempting to coerce Plaintiff into surrendering her rights.

138. Defendants' conduct was willful, knowing, and undertaken to secure improper advantage in connection with the commercial lease and related business dealings. The attempt to leverage tenancy to force an unfavorable and unlawful waiver of rights has the "extortionate quality that gives it the rancid flavor of unfairness."

139. Plaintiff suffered actual loss of money and property as a direct and foreseeable result.

COUNT VIII: Fraudulent Misrepresentation

140. Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

141. Defendants Joseph Leary, Copley Management & Development Corp., and Broadway Real Estate Trust made false statements of material fact concerning the build-out timeline and readiness of the premises.

142. Defendants knew the statements were false or made them recklessly. Plaintiff reasonably relied on the statements and suffered damages.

COUNT IX: Intentional Interference with Advantageous Economic Relations

143. Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

144. Plaintiff had existing and prospective business relationships and economic expectations with investors, employees, patients, and professional contacts.

145. Defendants knowingly and improperly interfered with those relationships through misrepresentation, obstruction, retaliation, and reputational sabotage. Plaintiff was damaged as a direct result.

COUNT X: Civil Conspiracy

146. Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

147. Defendants acted in concert pursuant to a common plan to drive Plaintiff and her business from the property and to suppress her rights by unlawful means. The conspiracy included coordinated misrepresentations, concealed permitting failures, coercive buyout efforts, retaliatory conduct, and reputational harm.

148. Plaintiff suffered damages as a direct result.

COUNT XI: Massachusetts Civil Rights Act (M.G.L. c. 12, §§ 11H, 11I)

149. Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

150. Defendants interfered with Plaintiff's secured rights by threats, intimidation, or coercion, including conditioning tenancy-related benefits on Plaintiff's silence and waiver of civil rights remedies. Defendants interfered with Plaintiff's secured rights, including: (i) her right to be free from discrimination in commercial leasing under M.G.L. c. 151B; (ii) her right to file a complaint with the MCAD and pursue civil-rights remedies free from retaliation; and (iii) her right to occupy and enjoy the leased premises free from intimidation and coercion.

151. Defendants' conduct violated the Massachusetts Civil Rights Act.

COUNT XII: Intentional Infliction of Emotional Distress

152. Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

153. Defendants' conduct was extreme and outrageous, exceeding all bounds usually tolerated by decent society. Defendants engaged in a sustained campaign of fraud, discrimination, retaliation, intimidation, and invasion of privacy that caused Plaintiff severe emotional distress.

154. Defendants acted intentionally and recklessly with the specific purpose of causing emotional distress or with reckless disregard of the high probability that emotional distress would result.

155. Plaintiff has suffered severe emotional distress, anxiety, depression, fear for her personal safety, and ongoing psychological harm.

PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment against Defendants as follows:

A. Award compensatory damages for financial losses, including lost business opportunities, lost earning capacity, depletion of capital, personal indebtedness, and expenses incurred in reliance on Defendants' false representations;

B. Award compensatory damages for emotional distress, mental anguish, loss of enjoyment of life, and harm to personal dignity;

C. Award compensatory damages for reputational harm, including lost professional standing, diminished credibility, loss of educational and mentorship opportunities, and interference with professional advancement;

D. Award compensatory damages for physical invasion of Plaintiff's home, property damage, loss of personal property, and expenses for security and relocation;

E. Award punitive damages for Defendants' willful, malicious, and reckless disregard of Plaintiff's civil rights;

F. Award treble damages under M.G.L. c. 93A, § 11 and/or attorneys' fees as appropriate;

G. Award injunctive relief prohibiting Defendants from further harassment, intimidation, or retaliation;

H. Award prejudgment and post-judgment interest;

I. Award costs and attorneys' fees pursuant to 42 U.S.C. § 1988 and applicable Massachusetts law; and

J. Award such other and further relief as this Court may deem just and proper.

DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all claims so triable.

Respectfully submitted,

Adonica Shaw

/s/Adonica Shaw

Plaintiff, Pro Se

3236 Clayton Rd

Concord, CA 94519